for the United States representative here in Jimenez. Mr. Martin, good morning. Good morning, Your Honor. I'm Jack Martin, along with Laura Maldonado. I was appointed counsel to represent the defendant in this death penalty trial here in San Juan. I would like to ask the court if it's possible to reserve five minutes of my time for rebuttal, if that would be okay with the court. That's fine. Thank you, Your Honor. This case involves an unusual situation where a proffer was made right before trial, an offer to plead guilty was made in order to resolve a death penalty case. We had a defendant facing the possibility of a death sentence.  And in working out that deal, one of the requirements was to make a proffer. That proffer was to be protected by the specific language of that proffer, which was it could not be used against him unless he testified, or it could be used to develop derivative evidence, like developing other evidence in the case, such as other witnesses and so forth. Despite the specific requirements of that proffer, during the trial the judge made it impossible for us to present the most compelling evidence we had available to prove his innocence. That was the evidence of a retired FBI chief of their photographic unit who would testify that the person that was seen in the video, this crime was caught on a surveillance video, was approximately six feet tall, whereas our client is, as the record reflects, five foot seven. Judge Foustay took the position that, well, that is a fact that you know, that you know you have this expert who is going to truthfully testify, based on scientific principles, that the person in the video is too tall to be your client. But your client offered to plead guilty, your client made a proffer admitting his guilt, which was a requirement in order to get a plea other than a death sentence. And in that situation, that fact, what he called a fact, you cannot present that expert unless that expert knows that fact. Your Honors, there are a lot of facts in a criminal case that don't exist. Illegally seized evidence is a fact, which doesn't exist. A confession that is obtained in violation of Miranda is a fact that doesn't exist. Privileged conversations between the client and the spouse, between the client and the clergy, is a fact that doesn't exist. This was a fact that is protected by the proffer, and it was unfair, and it violated the proffer, it violated our client's due process, Fifth Amendment, and Sixth Amendment rights to require the expert to know about that fact, because the fact would then become fodder for cross-examination by the prosecution. What's your response to the government's argument that the expert's testimony wouldn't have helped that much, because it wasn't convincing or effective or even? Well, we had the retired chief of the photographic unit to testify, and the report is in evidence, and it shows how he went to the scene, I was there, measured everything, measured the height of everything, had these photographic procedures, and he indicated that this person has to be at least five foot ten and a half, but probably six feet tall. They had a local FBI agent go out there and question some of his measurements. One of the measurements they couldn't question was if the victim was proved from the autopsy that she was only five one, and during the video, the problem with the video is you only see the back of the assailant, the five foot one, and supposedly my client is standing next to that person, and that person is well over six feet, around six feet. There's no question about those measurements. They could quibble about a few measurements. What I always wondered was if they were going to challenge our expert, they had the FBI laboratory to come in and do their own analysis of this. They didn't do that, they had some agent. It would be fodder for cross-examination, but I don't think it would have defeated the evidence. I think Judge Kayada's question perhaps goes more to the two witnesses who transported the victim to the scene who knew the defendant and testified that it was him. Well, we tried to explain that in our briefing, and the sites are in the brief, but both of those witnesses had made deals. They were originally charged with a death penalty offense. Judge Fustate kept us from even going into that, but that's a separate issue. They both made a sweetheart deal for 70 months, even though they were right in the middle of this murder. They both admitted that they had made incorrect information when first interviewed, had not revealed that they had made telephone calls to a guy named LeSean, who was a drug dealer, a drug mastermind here, that there were other people out there who they were fearful of, other people who were at large that if they didn't finger my guy, they would be in trouble with this person. You're right, they're cooperating witnesses. There's problems with their testimony. They identify my guy, but what's the most powerful evidence I can refute that with? You know, cooperating witnesses are going to say, as they did, we're just telling the truth, we just made an agreement to tell the truth, that's all we're doing. How do you challenge that? You bring in a former FBI agent and say, wait a second, those measurements don't fit their story. That's what a reasonable doubt is all about, scientific evidence to challenge cooperating witnesses. As a defense lawyer for 35 years, we have to fight cooperating witnesses all the time. And now we have in our pocket scientific evidence from an FBI agent to say, wait a second, not only do they have every motive to lie, not only do they have others to fear, but look, the size doesn't fit their story. If we were to let this ruling stand, would criminal defense lawyers think long and hard and be more reluctant to make proffers in the future? Yes, certainly. You know, if they think that by offering to plead guilty, by having their client say, well, what they always do in these proffers, they say, in order to make sure your client's telling us the truth, he's got to admit he did it. You're not going to do that ever again, because what you're saying, well, all I've got left now is whatever I can come up with cross-examination. I can't present any affirmative evidence of innocence. If I have an FBI agent who says those fingerprints don't match, can't put that in. If I have a DNA person who says that DNA doesn't match, can't put that in. So especially in the context of a death case, which I've done too many times, you're desperate to resolve that case. But now you're not going to do that. And the government has an interest in these proffers, too. They have an interest in having the information to know whether or not they should make a deal. But no one's going to give the government that information if they know in the future that it's going to come back to entirely defeat your opportunity to present any sort of innocence defense. In your experience, do defendants sometimes admit guilt to make a proffer to avoid a severe sentence, even when they're not guilty? Yes, short answer. I don't know. You never know, right? You never know what the truth is. But if you have that conversation in a death case and you come to him out at the MVC and you say, listen, we can avoid a death sentence, but you've got to admit you did it. And even though when he was first arrested he said the person in the video was his brother Raymond, you've got to admit it or we're going to trial on a death sentence. Who knows what that dynamic would do? Who knows what I would do? Who knows what you would do in that situation? I'm not saying anybody tells a client to lie. You tell them what the circumstances are, they make their own decision. But if this ruling stands, it's going to complicate the whole process of proffers in this district. I'll say one other thing. The government has argued that Judge Fouste never said that the proffer would come in on cross-examination. I referred you to the afternoon of April 29, the testimony. Judge Fouste has a tendency to talk in metaphors sometimes. But he says, and I read to you from line seven on page 20, me. But you understand my dilemma. If that's the fact, then he'd be cross-examined about that, and then it comes in so you're stuck. Fouste, no, because you want to have your cake and eat it too. Me, no, I just want to have the cake. Fouste, you want the opinion, you don't want the proffer, and you're resting on the ladder. Now, I give you the ladder, but I cannot give you the other part. Well, I don't want to belabor the metaphor too much, but I don't think I'm asking for cake and to eat it. I'm just asking for what we're entitled to. I don't think any court of appeals is going to say that you're entitled to present an expert who's going to give an opinion on something that is factually wrong. That's his problem. He's wrong about what's a fact. A proffer doesn't exist unless it's up on the terms of the proffer, on something that is factually wrong, and you know it, and I know it. It's quite clear he's saying there, you can't have your cake and eat it too. In other words, you can't have the proffer, I mean, excuse me, the scientific testimony, without having the cross-examination about the proffer, which defeats the whole proffer from the very beginning. There's no question that that was what was going to happen, and you have to read the transcript. It comes up in the government's argument, and I have more sites of that. It's quite clear that it was a definitive ruling by Judge Fouste. I'm not going to let that expert testify unless he knows about the proffer, and you're just going to have to eat it. I'll reserve the rest of my time. Thank you. Mr. Katz, good morning. May it please the Court, Luke Katz on behalf of the United States. Your Honor, there's an insinuation both in the briefs and here today that the defense was somehow induced into giving a proffer in this case, and just to dispel that, I would suggest that this was an avenue that the defense pursued. And just to give you background, on March 1st, 2013, there's a status conference before Judge Fouste. A brother counsel says that he's had conversations about resolving this case by way of a plea agreement. The attorney from the capital case unit... What difference does that make, whether he was induced or whether he gave it voluntarily? The terms of the proffer are what matter to us, not the reasons for which it came about. I understand your question, Your Honor. It's just that it makes it seem like we induced him to give a proffer to later use it at trial against him, and that simply wasn't the case, Your Honor. Sorry, are you finished? You have to explain to me, because it's a procedure I have never seen and I'm unfamiliar with, of a judge telling a party what he has to or she has to tell a witness before they testify. Well, Your Honor, he didn't make... Just answer the question, then you can explain to me, because I have never heard of this procedure before. I have never seen it before either, Your Honor. So it's unusual. It is unusual, Your Honor. Okay. Thank you, you answered my question. Yes, sir. But it's the government who raised the issue in the first place. It is, Your Honor, and we believe we had an obligation to do so. And importantly, Your Honor, Judge Fuste never actually said he could not call the expert. That's contrary to the record. He agrees the proffer language does not bar it. He says that I'm the gatekeeper of what expert testimony goes before the jury. Under Rule 702, I have a reliability, a gatekeeper function to perform, and that I am just telling you that these are my impressions at this time. I'm giving you a, and he calls it an advisory opinion, Your Honor. He rewrote the proffer agreement. The proffer agreement that you negotiated, your office negotiated, specifically set forth what the condition was that would allow admission of proffer into evidence, and that was that Jimenez took the stand and said anything contrary to the proffer. So that was the deal. The judge has then amended it to say, oh, yeah, it's also going to come in if you should try to put this expert on the stand.  Well, that's the way it reads. He said he's thinking of that, he said if the expert comes in, Your Honor, he says I am going to warrant him outside the presence of the jury. I'm going to get into his qualifications, and I may decide that this is a fact that he may need to know in order, if it changes his opinion or not. Let's assume, but we'll get to the question of what the judge said. Let's assume that it's reasonable for defense counsel to have understood him to say that if you put on the expert, the proffer is coming in through cross-exam. Isn't that rewriting the agreement? That would be rewriting it, Your Honor, but that's respectfully not what happened here. So you're down your argument, then, as I understand it, comes down to an argument that the judge actually wasn't going to allow cross-examination that would mention the proffer. Right, Your Honor. And what – read us the line in the – Sure. He – there's – actually, we moved to unseal Wednesday an in-chambers conference that we had with a judge who said it wasn't part of the record, which he talks about the proffer and – Stick to the record. Yes, Your Honor. That will be part of the record, but it's – he says forget about the proffer, forget about ethical questions. We have an expert here who's going to give an expert opinion that is contrary to a fact that you know to be false. And based on that, he goes, I'm not giving you – and then he says, I will let you call the expert if you want, but if you're forewarned that if that – that this is a situation that could happen. Based on that, Brother Counsel says, I understand. Given that, we don't want to take that risk. And then Judge Rousseau even goes further, and he says that I want this to be clear. When this is on appeal, no one is foreclosing you. I'm giving you my thoughts as this progresses. I want to see it in context. So what you just said to me says, call the expert, but I'm forewarning you that something bad may happen. It's a possibility, yes, sir. What was the bad thing that he was warning him was going to happen? That he could – that the expert witness could be apprised of the proffer. In front of the jury? No, not in front of the jury, Your Honor.  Well, in any event, the district judge was trying to influence what the expert witness would testify by the fact that he would be told beforehand that he was telling a lie. He was thinking about it, Your Honor. Well, he wasn't just thinking about it. He was, as I understand it, stating it for the parties. But it was never – the reason I say it that way, Your Honor, is because he never was embodied in a final ruling. Well, because he – because the lawyer for the defendant decided he would not take that risk. Right, and that was – Based on what the judge had said. And he said that you may be – at one point, Your Honor, he does tell defense counsel, he goes, you may be able to convince me the ball could bounce your way. And he affirmatively chose not to do it, so we don't know. That's why it's a ripeness question, too, Your Honor. Yes, sir. Wouldn't this rationale apply in every case, every single case in which there's a proffer, in which the defendant admits guilt for purposes of the proffer? Then wouldn't it follow, under what the judge did here, that if at trial, any defense witness tried to testify to any fact that would suggest the defendant is not guilty, that we'd get into the same situation where the judge would say, nope, before he testifies, he's got to be told about the proffer, and then leaving doubt as to what happens at that point. Well, Your Honor, it's such a stark contrast based on the facts of this case, where he – through the proffer, he admits that – Well, take an alibi witness. Why wouldn't – suppose the defendant put on an alibi witness that said, he was home watching me at the time of the murder. Why wouldn't the judge's rationale apply exactly to that? I want the alibi witness to know about the proffer. I think it would depend, Your Honor, on the circumstances. Certainly, that could be an issue, similar to this one. But here, Your Honor, you have the proffer agreement, which he says, in consideration for a guilty plea, we are willing to admit that he killed Ms. Sanchez using a gun that was given to him as a present. He did so because he was going to, out of fear that he would turn him into federal authorities. Well, now you're just saying the proffer is accurate. I'm sorry, Your Honor. No, I'm just – I'm setting up the contrast, Your Honor, to hopefully respond to your question, where – and then at the same time, you're saying that the person in the video is 6'2". It's not him. And, Your Honor, there's multiple reasons why you would want to give a proffer. How does that differ from the alibi witness? It's similar, Your Honor. In fact, the alibi is more of a conflict, because the alibi is actually definitively saying the person was somewhere else, and you put a proffer saying he wasn't. It seems to me the judge's rationale would apply even more strongly to an alibi witness. It would apply, yes, Your Honor. Now, there are tens of thousands of proffers entered into in the United States, and a lot of those go to trial. Can you cite us any other case anywhere where any judge has decided to interject himself into the preparation of the witnesses and forewarn people about some risks should they put the witnesses on? There is a case that we cited in our brief called Burnett from the Eastern District of Pennsylvania that is slightly different circumstances, but the defense counsel makes an argument that he's being handcuffed by the proffer, and the court comes back and discusses this, and he says, citing the Pennsylvania model rules, that you're being handcuffed by the truth. It's similar, Your Honor. It's not the same. There's also Lawrenson out of the Southern District of New York, which are two cases we cited. And, Your Honor, there's other reasons why you would want to give a proffer. There's a penalty phase that goes on. You use that to show mitigation. So this is... Aren't proffers an important tool for the Justice Department? Yes. Having people make proffers very much helps in the prosecution and processing of criminal cases. Yes, Your Honor. And so under this rationale, isn't it now going to give rise to an impediment that will make it a little less likely that the Justice Department in this district will be able to use that important tool, thus impeding the prosecution of crime? It's possible, Your Honor. That is possibly. That's why we made it clear when we filed the motion on April 23rd that we were not seeking to rely on it in any way. We're not seeking to introduce the statements in any way. This is an issue that we felt obligated to bring to the court's attention, based on the fact that the model rules are applicable and mandatory on practitioners in the district court hearing. But you would be introducing... On cross-examination of this expert witness, you would be doing exactly that. You would be introducing the defendant's statement that the proffer indicates can only be used if the defendant testifies. Not necessarily, Your Honor. We don't have the opportunity to see what he would have come in, what he would have said, how it would have went. I mean, we could have very easily, if he was seated, not gone into the proffer at all because his measurements were so flawed. We took our own measurements. They were severely off and just stayed with that. But it's the government who raised the issue that it felt the witness needed to know this. It's the government who got this ball rolling. Well, we didn't say that the witness needed to know it, Your Honor. We said that the court needed to know it because this was an ethical dilemma that we wanted on the record, Your Honor. That was in the district court that they fashioned that, that the expert may have to know. And the judge said it was his gatekeeping function or 702. We never affirmatively moved for that, Your Honor. But it was the government who raised the fact that there was a proffer that had been made that used the defendant's statement against him. That's right, Your Honor. Wasn't that even a violation of the proffer? Because the proffer set forth the conditions by which the government could use it. You could make derivative use of it. Where in your agreement that your office made did you have the ability to use the proffer in the manner you did use it? We argued this in our brief, Your Honor, that this would qualify under as a derivative use. It's not a direct use. We weren't seeking to put it into our case in chief. You mean saying that the judge is a proffer and we think that raises an ethical issue is not a direct use of the proffer? We would argue, Your Honor, that it is a derivative use of the proffer. Just briefly, Your Honor, I'd like to touch on the cross-examination restriction. Again, no one – Judge Fuste did not prevent him from getting into the cross-examination of the witness. If you look at the question that drew the objection to Mr. Parris, who was one of the cooperating witnesses, he was one of the people that drove Ms. Sanchez to the market where she was killed. And the question was, when you were arrested for your involvement in this case, a death-eligible indictment was filed against you. And that simply was not the case. He was not charged with a death-eligible indictment. Well, a complaint was filed against him. Is that correct? That's right, Your Honor. And it was a death-eligible complaint initially. That's right. And he offered to rephrase the question because he realized that it hadn't gone to the indictment stage. Is that correct? That's right, Your Honor. So what is it – speaking of what is factually correct, if it was factually correct that that complaint was filed, which was death-eligible, why would the defense not be allowed to ask the witness about that? Because, Your Honor, the judge found that based on a holistic view of everything, it was a misleading question. And it was misleading because –  It's a fact. And the government had every opportunity to clarify what its version of what happened would be. I don't understand why the defense should be hampered from asking what historically, factually occurred in this case. But, Your Honor, if you see at the sidebar, at the record, the government goes through the sequence of events. The Ms. Sanchez murder occurred on June 21, 2013. Mr. Perez was arrested the next day and a complaint was filed the next day. And it was reactive and initially – So the defense, in your opinion, is stuck with the government's version of what happened. That's what you're saying. And can't contest that that's what happened. The government – our statement would be the defense is stuck with the version of the truth in this case, which is that – Well, the truth is that the complaint was filed initially. And then we stated to the judge, Your Honor, that we did not have evidence to support that at all. That actually we could not prove intent as to Mr. Perez or Ms. Albino and that it was something that was done in a reactive manner. Actually, Judge Fuste spoke to the defense attorneys for both cooperators and said, was this a quid pro quo? Was his cooperation based on non-capital charges being filed? And that was not the case. Everyone confirmed that, Your Honor. So to put that, I think, before the jury is misleading, Your Honor. You could bring this up in your examination rather than prevent the question based on facts as they stood originally being made? Yes, Your Honor. Could we have brought it up? Yes, Your Honor. Your answer is yes, you agree with me, or yes, it could have been done? Yes, it could have been done. Well, then the judge was wrong. And we could have brought it up on our direct examination? I'm sorry, Your Honor, I don't think I understood the question. The judge was wrong to exclude it, exclude a fact, a historical fact as to the travel of the charges against the cooperating witnesses. But even during opening, Your Honor, the defense argued that the cooperators in this case could be sitting in a judgment of death penalty case, but they, quote, made a deal. So that argument was still allowed to be made to the jury, Your Honor. I would respectfully submit. And there was a whole host of other impeachment avenues that they pursued about their associations with members of drug trafficking organizations, drug use, and possession of illegal firearms. So if Your Honor would find that it is there, we would submit that it would be harmless there. If there's no further questions, I can start our brief. Thank you. Thank you. We'll take a short recess. Oh, sorry. I don't know if I need to use all five minutes. I will point out, while respecting Mr. Cass, this is what the transcript says that Judge Fuste. It wasn't equivocal. This is on page 55 of the April 30th transcript. The court, what you don't have the right is to withhold facts from the expert about admissions that your client made and that pretend that I sit here and listen to the expert tell something that you know and I know is false. This is when I'm trying to make a proffer of what we're going to say. Later, line 25, what you cannot do. What page of the record is that? Page 55 of the April 30th transcript, lines 11 through 14. Line 25, what you cannot do, I once again say, is pretend a federal judge sits on a bench to hear an expert who has not been given all the facts say something that I know and you know is false, that I will not allow. Not in this courtroom. I mean, how can you be any clearer that he wasn't going to allow that witness to testify unless he knew about that proffer, thereby making it the first question? I know Mr. Cass said, well, maybe we wouldn't ask it. What prosecutor in his right mind wouldn't ask that as the first question? Well, didn't you know that the defendant admitted he did this? With regards to the question about the alibi, we've cited this in our brief, but the State Bar of Michigan had that exact issue before them about the alibi witness, presenting an alibi witness that the defense counsel knew, was truthfully thought there was an alibi, but they knew from what the client said that they were wrong about the alibi. And the State Bar of Michigan said that was not unethical. Indeed, it would have been unethical for him not to present those alibi witnesses. The line is criminal defense counsel are not sent to the jail interview room to be their client's one-person jury, and they certainly are not dispatched to court to be their client's hangman, which is what this case was all about. I'll say one final thing about the cross-examination. Not only, Judge Thompson, was it a death penalty complaint that was filed. Under local court rules here, the government is required to file under Rule 144 a notice that this is a death-eligible crime. And the consequence of that under local court rules is that learned counsel, like me, are reported in the case. So this wasn't some reactive decision. They went to the trouble to certify the case as a death-eligible case. And indeed, learned counsel were reported and brought to this court to represent the defendant on a death penalty case. And merely because, I mean, it's not unusual for the cooperating witness to say, well, that plea agreement had nothing to do with my decision here. That death penalty charge had nothing to do with my decision. The classic Supreme Court case is Davis v. Alaska. The cooperating witness was a probationer and claimed, well, the probation had nothing to do with my testifying for the government. And the Supreme Court said, no, that circumstance enough. It's something the jury should know because it might affect the decision. And in the Delaware v. Van Arsdale case, the follow-up case, the cooperating witness had a public drunkenness charge. Here we're talking about a death penalty charge. And he said, well, that public drunkenness had nothing to do with my decision to testify. And the Supreme Court said, no way. The defense has a right to go into that to search, to search for the motivations of the witness to testify. To the extent that we can find additional sites to the record verifying that Judge Foustay specifically, I don't think I have to after what I just read, said he wasn't going to allow it and that he would, clearly this would be fodder for cross-examination, I would ask the court to allow us under local rule 28J to supplement with any specific sites to the record, which we haven't made. I think we already made them, but I'd like to look one more time. And if there are any more to respond to counsel on that, we would be happy to do that. Is five days enough? That's enough, sir. All right. You have five days in which to file a 28J notifying the other side, which will have five days to respond. Thank you. Any additional questions? Otherwise, I'm finished. Thank you. Thank you. We'll adjourn for a few minutes.